In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1630

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEVIN L HICKS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 05-CR-043—**William C. Lee**, *Judge.*

———————

ARGUED JUNE 10, 2008—DECIDED JULY 9, 2008

———————

Before POSNER, COFFEY, and FLAUM, *Circuit Judges.*

FLAUM, *Circuit Judge.* Kevin Hicks was arrested when
police responded to a 911 caller who reported that an
armed man was beating a woman. Hicks was charged
with being a felon in possession and moved to suppress
the gun on the grounds that the officers lacked reason-
able suspicion to stop him because of the striking incon-
sistencies in the 911 call. Specifically, the caller gave two
different names for himself, said that he was inside a
house before admitting that he was outside, and revised
his position on whether the man he was reporting had a
gun. The district court denied the motion, and Hicks
entered a plea of guilty that preserved the suppression

issue for appeal. Although the transcript of the 911 call reveals a somewhat questionable accusation, the responding officer, who did not hear the call, reasonably relied on the straightforward information that was transmitted to him. Thus, we affirm.

## I. Background

The strange story behind this case begins with a romantic triangle involving Hicks, Sylvia Lynn McClendon, and David Woodbury. Today, Hicks and McClendon are married. While Hicks was in pretrial custody, the district court granted his Motion for Order to Allow Defendant to Have a Marriage Ceremony Performed at the Allen County Jail. But in the summer of the 2005, the two had recently split up and McClendon sought amorous attention from Woodbury. As McClendon put it, after having a few drinks with Woodbury, she "decided to have some needs met." After their intimate encounter, Woodbury telephoned Hicks. Although Woodbury did not say anything except repeating "hello," Hicks recognized his voice and immediately went to his house. Woodbury met Hicks outside the house and told him that McClendon was there. After Hicks pushed his way inside, he and McClendon argued loudly, though McClendon testified that he did nothing physical to her beyond grabbing her arm and forcing her to sit when she attempted to leave.

While McClendon and Hicks argued inside the house, Woodbury—who was still outside—made another phone call, this time to 911. He gave the address of the house where McClendon and Hicks were arguing and told the operator, "There's a guy beating a woman up in my house." He also told the operator that the man in ques-

tion had a pistol and that he was threatening to shoot the woman. When asked, Woodbury gave a fake name, "Albert C." Woodbury had claimed to be inside the house, but when the operator said that she didn't hear any fighting over the phone, Woodbury told her that he was actually outside on a cell phone. When she asked for his name a second time, he answered, honestly, that it was David Woodbury. Then the operator asked Woodbury the cell phone number from which he was calling, but he told her that he was calling from his home phone. Woodbury contradicted himself a third time when the operator attempted to confirm that the man Woodbury was reporting had a pistol. First he hesitated, but later he told the operator that the man he was reporting did not have a gun. The 911 operator asked Woodbury, "What color shirt do you have on just so we know that it's you when we approach?" Woodbury told the operator that he was dressed in black and she confirmed that Woodbury was a black man dressed in black.

While Woodbury was talking to the 911 operator, the operator was relaying the information to the dispatcher, but the record does not reveal how she relayed the information. The operator's testimony suggests that the dispatcher was listening to the call or that the operator was entering the information into a computer system to which the dispatcher had access, but the dispatcher testified that sometimes such information is communicated by shouting it across the room. In any case, the dispatcher sent police to the address given by the 911 caller and told them to respond to a "46/62," codes for domestic disturbance and suspect armed, respectively.

Officer David Tinsley was the first officer to respond to the dispatcher's call. According to his report, after he

saw a man wearing all black who he believed was walking away from the reported address, he radioed dispatch. The dispatcher informed Tinsley, "He is a male black wearing a black shirt," but the dispatcher did not clarify to whom the pronoun "he" referred. Officer Tinsley believed that "he" referred to the suspect, explaining later that he was "advised that the perpetrator of the domestic disturbance had just left and was a black male wearing a black shirt and black pants." Officer Tinsley believed that he had located an armed suspect—Hicks later agreed that he was dressed in black—and approached Hicks, who had walked to the driveway of a neighboring house where he was talking to Woodbury. Tinsley reported that Hicks asked Woodbury, "Man, Dave, why'd you do me like this?" and began to walk away. When Hicks began to enter the door of a nearby home, Tinsley and Sergeant Lapp, who had just arrived, ordered him to stop. Hicks did not stop, though, so Tinsley opened the door himself, grabbed Hicks's arm, and placed him in handcuffs. Tinsley reported that he was about to start a pat-down search when Hicks informed him that he had a gun in his right front pants pocket. Tinsley removed a loaded revolver from Hicks's pocket and, after discovering that Hicks was a felon, placed him under arrest.

Hicks testified at the suppression hearing and did not substantially contradict Officer Tinsley's version of events. He agreed that he had ignored the officers' commands and tried to elude them by walking into the nearby house. Hicks also testified that he had picked up the gun when he was in the house arguing with McClendon in order to protect himself from Woodbury and to protect McClendon from herself.

The district court denied Hicks's motion to suppress twice, holding both times that Officer Tinsley had reasonable suspicion to stop him. In its second denial, the court explained that the information relayed to the 911 operator and to the dispatcher was irrelevant to determining what Officer Tinsley knew at the time he made the stop. Looking only at what Tinsley actually knew, the court concluded that he had reasonable suspicion to stop Hicks. The court also noted the presumption of reliability given to emergency reports made in 911 calls that we recognized in *United States v. Drake*, 456 F.3d 771, 774-75 (7th Cir. 2006), and held that Tinsley could rely on the dispatch report because he was not aware of the inconsistent information the caller had given.

## II. Discussion

Hicks argues that the district court erred when it held that Officer Tinsley had reasonable suspicion to stop him. In an appeal of a ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *See United States v. Barnett*, 505 F.3d 637, 639 (7th Cir. 2007).

Hicks and the government agree that Officer Tinsley's conduct must be reviewed under *Terry v. Ohio*, 392 U.S. 1 (1968), which holds that an officer may conduct "a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). The determination of whether the officer had reasonable suspicion is an objective inquiry based on the totality of the circumstances known to the officer at the time of the encounter. *United States v. Lawshea*, 461 F.3d

857, 859 (7th Cir. 2006). Under most circumstances, when an officer observes someone who fits the description given by a dispatcher of a person involved in a disturbance and the observation is near in time and place to the disturbance, the officer may stop the suspect. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003). Hicks argues, however, that things are different when, as he characterizes the facts of this case, the officer's knowledge stems from miscommunicated information gleaned from a nearly anonymous and completely uncorroborated tip that contained several inconsistencies.

Hicks's argument begins with the Supreme Court's holding in *Florida v. J.L.*, 529 U.S. 266 (2000), that an anonymous and uncorroborated tip did not justify a *Terry* stop. *Id.* at 271. But *J.L.* did not hold that all anonymous or uncorroborated tips are unreliable; instead, it emphasized that the tip in question came from an unknown caller at an unknown location and provided no information that would allow the police to test the informant's credibility. *Id.* More importantly, though, the *J.L.* Court did not treat the tip as one reporting an emergency. *Id.* at 268.

The argument under *J.L.* fails, first, because the tip here reported an ongoing emergency. Every circuit to consider the question, including this one, has distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency, *United States v. Brown*, 496 F.3d 1070, 1077 (10th Cir. 2007); *United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007); *Drake*, 456 F.3d at 775; *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004); *Anthony v. City of New York*, 339 F.3d 129, 136-37 (2d Cir. 2003); *United States v. Holloway*, 290 F.3d 1331, 1338-39 (11th Cir. 2002), or very recent criminal activity, *Terry-Crespo*, 356 F.3d at 1176-

77; *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000). The *J.L.* Court itself acknowledged that it was not deciding whether an anonymous tip alleging a greater danger than mere possession of a firearm might justify a search based on a lesser showing of reliability. *Id.* at 273-74; *see also United States v. Goodwin*, 449 F.3d 766, 769-70 (7th Cir. 2006).

This case is also distinguishable from *J.L.* because Woodbury gave his name, his location, and described his clothing; that is, he was not anonymous. Courts, including our own, have distinguished *J.L.* when the tipster gives her name or other identifying information to the 911 operator. *Brown*, 496 F.3d at 1075-76; *United States v. Elmore*, 482 F.3d 172, 181-83 (2d Cir. 2007); *Drake*, 456 F.3d at 774; *United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004); *Terry-Crespo*, 356 F.3d at 1174-75; *United States v. Quarles*, 330 F.3d 650, 655 (4th Cir. 2003); *United States v. Harris*, 313 F.3d 1228, 1235-36 (10th Cir. 2002); *United States v. Browning*, 252 F.3d 1153, 1157-58 (10th Cir. 2001). The Second Circuit summarized these holdings to mean that reasonable suspicion may be based on a telephone tip when the caller provided enough information to allow police to "identify her and track her down later to hold her accountable if her tip proved false." *Elmore*, 482 F.3d at 182. This rule finds support in *J.L.* where the Supreme Court noted the reliability of a known tipster "whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." *J.L.*, 529 U.S. at 270.

Hicks's final attempt to use *J.L.* is to argue that the tip was not reliable because it lacked predictive information that would allow Officer Tinsley to test it. But the type of testing that Hicks believes Tinsley needed to do before

the stop, *see, e.g.*, *Alabama v. White*, 496 U.S. 325, 332 (1990) (*Terry* stop reasonable after "significant aspects of the caller's predictions were verified"), would almost never be possible in an emergency situation. As the Ninth Circuit has explained, "Police delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and undermine the 911 system's usefulness." *Terry-Crespo*, 356 F.3d at 1176.[1]

A rule requiring a lower level of corroboration before conducting a stop on the basis of an emergency report is not simply an emergency exception to the rule of *J.L.* Cf. *New York v. Quarles*, 467 U.S. 649 (1984) (emergency exception to rule of *Miranda*). It is better understood as rooted in the special reliability inherent in reports of ongoing emergencies. Based on that special reliability, the Supreme Court has held that reports of ongoing emergencies made in 911 calls are subject to less testing in court than other out-of-court statements. *Davis v. Washington*, 547 U.S. 813, 827-28 (2006) (contents of 911 call reporting an ongoing emergency not "testimonial," so not subject to Sixth Amendment's right of confrontation). Similarly, when an officer relies on an emergency report in making a stop, a lower level of corroboration is required.

---

[1] The danger posed by not quickly responding to a 911 emergency call is reflected in the case of one overly-skeptical 911 operator who was prosecuted for doubting and refusing to order a response to a genuine emergency report. *See* Darren A. Nichols & Doug Guthrie, *Family Relieved After 911 Operator Convicted*, DETROIT NEWS, Jan. 19, 2008, available at http://www. detnews.com/apps/pbcs.dll/article?AID=2008801190357 (last visited June 27, 2008).

So *J.L.* does not govern because Woodbury gave the 911 operator enough information to identify him and his location, and because he reported an ongoing emergency. Hicks also relies on an argument based on the collective knowledge doctrine, under which, when officers are in communication, the knowledge of one officer is imputed to the other. *See United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005); *Lenoir*, 318 F.3d at 728. Thus, if the court imputes the operator's knowledge to Officer Tinsley, as Hicks urges, then Officer Tinsley "knew" that it was Woodbury, the caller, who was dressed in black and that Woodbury's call was riddled with inconsistencies. But imputed knowledge does not trump actual knowledge, even when that actual knowledge is later shown to be false, so long as reliance on it was reasonable. *See United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001). As we have explained, "The reasonableness of the seizure turns on what the officer knew, not whether he knew the truth or whether he should have known more." *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007). Thus, despite the inconsistencies known to the 911 operator and the miscommunication about who was dressed in black, the information that Tinsley reasonably believed the dispatcher gave him before he made the stop—that an armed black-clothed black man was involved in an ongoing domestic disturbance—created reasonable suspicion for the stop. *Mounts*, 248 F.3d at 715; *see also Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008) (possible carelessness of security guard who made faulty report of robbery "cannot be pasted on to the police officers" who responded to report).

The last argument to consider is particularly weak. Hicks places great weight on the final words recorded in the

911 call. Woodbury said, probably to Officer Tinsley, "Sir, he's alright, he's alright, he's alright sir." Hicks believes that once Tinsley heard that Hicks was "alright," he no longer had reasonable suspicion to stop him and should have left him alone. But Tinsley had no reason to know that Woodbury was the 911 caller. And even if Tinsley had known that he was hearing from the original accuser, things would be no different because in determining who to arrest or stop, officers may rely on the testimony of an eyewitness even when the eyewitness later changes his story. *See Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006).

Finally, a word about *J.L.*'s concern that sanctioning stops prompted by anonymous tips might "enable any person seeking to harass another to set in motion an intrusive, embarrassing police search." *J.L.*, 529 U.S. at 1379-80. The facts of this case—as well as the *J.L.* Court's speculation that it might have ruled differently had the report been of a person carrying a bomb (that is, an emergency), *id.* at 1380—show the limits of that concern. Surely, anonymous tips about emergencies cannot always be trusted—although frequency data does not exist, fraudulent 911 calls are agreed to be a dangerous problem. *See* Rana Simpson, *Misuse and Abuse of 911* at 5-7 (U.S. Dept. of Justice, Problem-Oriented Guides for Police Series, No. 19, 2002), *available at* http://www.popcenter.org/problems/ pdfs/Misuse_and_Abuse_of_911.pdf (last visited June 27, 2008). But any body of law requiring 911 operators to carefully make credibility determinations would unacceptably delay the necessary responses to *all* emergency calls, including genuine ones. In any event, *J.L.*'s concern about harassment by an unaccountable tipster is not present in this case because the call was recorded, the

caller gave his name, general description, and location, and he explained how he knew about the ongoing crime.

## Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Defendant's motion to suppress.