In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3134

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANTHONY HAMPTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06-CR-183—**John Daniel Tinder,** *Judge.*

ARGUED JANUARY 5, 2009—DECIDED NOVEMBER 4, 2009

Before EASTERBROOK, *Chief Judge,* and POSNER and
WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* A series of 911 calls reporting
shots fired in broad daylight led police officers to a busy
area in Indianapolis to arrest the gunman. One caller
fingered the occupants of a white sports utility vehicle
("SUV"), which carried defendant Anthony Hampton.
When officers stopped Hampton and the driver, they
recovered two guns. After applying enhancements be-

cause of Hampton's previous felony convictions, the court sentenced him to 387 months' imprisonment. We affirm Hampton's conviction because we conclude that the officers had reasonable suspicion to stop the SUV in which Hampton was riding and that there was sufficient evidence to show that Hampton constructively or actually possessed the gun. As to his sentence, although we agree with the district court that a conviction for residential entry in Indiana qualifies as a "violent felony" for the purposes of the Armed Career Criminal Act ("ACCA"), we conclude that Hampton's prior conviction for criminal recklessness in Indiana does not qualify, and therefore, Hampton must be resentenced.

## I. BACKGROUND

Anthony Hampton was charged with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). His arrest arose out of events that occurred on July 13, 2006. The Indianapolis Metropolitan Police Department received several 911 calls after someone fired shots in a parking lot behind a Subway restaurant in Indianapolis.

The first 911 call came in at 4:29 p.m., when a woman who identified herself as Monica Drawn called and reported hearing five gunshots outside of her apartment building at 3777 N. Meridian Street. She described two African-American men getting out of an SUV near Subway and standing behind a dumpster. She said one man wore black shorts and a black shirt. Eleven seconds later, a man who identified himself as John Adkins called

911 and reported hearing six or seven shots. He also described seeing an African-American man, wearing a dark, short-sleeved shirt, running with a gun in his hand. One second later, a Subway employee called 911 and stated individuals were shooting from inside an orange van.

At 4:33 p.m., police arrived at the scene. Drawn called 911 again and reported that the man with the black shorts and shirt whom she had called to report earlier had just walked past police officers. The 911 dispatcher relayed this to officers on the scene, and Drawn was able to verify that the person had white beads in his hair. One minute later, another caller, later identified as Anthony Smith phoned 911 and reported watching the shooter stand between two buildings near Pennsylvania and 38th streets talking on a cell phone. Smith would later testify that he recognized the shooter as Anthony Hampton because he was from the neighborhood. However, he did not report to the 911 operator that he recognized Anthony Hampton or that the person he was watching supposedly was holding a gun. He described the person as a bald, black man wearing blue jeans and a blue shirt with stripes. Smith also reported that he saw the man get into a white Jeep Cherokee with Ohio plates and head northbound on Pennsylvania Street. Smith initially hesitated to meet with the police because he was fearful that the "shooter" saw him. Smith eventually gave the 911 operator his name (albeit after the police initiated the traffic stop), a description of what he was wearing and his location so that officers could

speak with him. After officers arrested Hampton, they learned that Smith did not actually witness the shooting.

Meanwhile, officers stopped a white Jeep Commander with Ohio plates after the driver turned without signaling.[1] The officers asked the two men to get out of the Jeep. One man was the driver, Justin Gray. The other man, later identified as Hampton, was seated in the rear passenger's side seat. Hampton wore a blue shirt with yellow stripes across the chest. One officer would later testify that Hampton was sweating profusely and looked disheveled. The officers searched the Jeep and found two firearms—a black Ruger handgun under the driver's seat and a chrome Smith & Wesson revolver near the rear seat on the driver's side. Police later brought Smith to the scene of the traffic stop, and Smith identified Hampton as the individual he had seen between the buildings.

At about 4:50 p.m., Keith Moore called 911 and reported that he had just witnessed almost the entire event unfold from the roof of his high-rise apartment building where he was relaxing by the pool with a beer. At Hampton's trial, Moore testified that after the initial shot, he stood on a chair at the edge of the pool deck,

---

[1] For reasons that are unclear (perhaps because the probable cause affidavit did not mention the traffic violation), the government did not argue in the district court that the traffic violation provided an independent probable cause basis for the stop, nor does it make this argument now. *See United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000).

peered over a fence and witnessed an African-American man firing a large, silver handgun toward an apartment building behind a Subway. He also saw another black man wearing jeans and a blue jacket in the Subway parking lot. He saw the second man enter and leave in a maroon minivan. The gunman stopped and talked to two individuals in front of the Subway, and those two men headed westbound. The gunman then placed the gun in his waistband. Moore also reported the gunman wore blue jeans and a blue-collared shirt with a yellow band around the chest. Police took Moore to the scene of the traffic stop, and he identified Hampton as the individual with the large, silver handgun.

Later, officers discovered an orange Nissan Murano in the Subway parking lot with two bullet holes in the hood. Hampton's girlfriend testified at his trial that she had loaned the Murano to him and stated there had not been bullet holes in the vehicle before she gave him the car on the afternoon of July 13, 2006.

Before the trial, the district court denied Hampton's motion to suppress the Smith & Wesson chrome revolver, the gun he was charged with possessing. Following a two-day trial, a jury convicted Hampton. The court, applying the sentencing guidelines in combination with the ACCA, 18 U.S.C. § 924, determined Hampton's offense level was 34, his criminal history category a VI, and the resulting guidelines range a range of 262 to 327 months. It then chose to add four levels to Hampton's offense level in light of his extensive criminal history for a final offense level of 38. That resulted in a guidelines

range of 360 months to life. Stating that the sentence would reflect an additional 60 months from the high end of the Guidelines range had it stayed at level 34, the court sentenced Hampton to 387 months' imprisonment.

## II. ANALYSIS

### A.  Reasonable Suspicion Justified the Stop

First, Hampton appeals the district court's denial of his motion to suppress. Hampton argues that the officers lacked reasonable suspicion to stop the SUV in which he was riding and that the 911 operators were not trained to establish reasonable suspicion. Second, Hampton challenges the reliability of Anthony Smith and argues that his 911 call failed to provide police with reasonable suspicion and therefore the stop was not justified because the call served as the only link between the shooting and a white SUV. Hampton submits that the emergency ended before Smith called and that even if the emergency remained ongoing, Smith's reliability was undercut because his tips were contradicted by facts known to the police, such as that the shooter was wearing black shorts and a black shirt. Hampton also contends that if 911 operators had asked Smith's name prior to stopping the Jeep, they would have learned that in 1998 he had been convicted of falsely reporting a shooting.

When reviewing a motion to suppress, we examine questions of law de novo and questions of fact for clear error. *United States v. Montgomery*, 555 F.3d 623, 629 (7th

Cir. 2009). We review Hampton's stop under *Terry v. Ohio*, 392 U.S. 1 (1968). Police may initiate an investigatory stop when the officer has reasonable suspicion that a crime may be afoot. *Id.* at 30. When an officer makes a *Terry* stop, he must be able to point to "specific and articulable facts" that suggest criminality so that he is not basing his actions on a "mere hunch." *Id.* at 21; *United States v. LePage*, 477 F.3d 485, 487 (7th Cir. 2007). When reviewing the reasonableness of a *Terry* stop, we evaluate the totality of the circumstances. *Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008).

We begin with Hampton's argument that Smith was an anonymous tipster whose call did not give rise to reasonable suspicion. In *Florida v. J.L.*, 529 U.S. 266 (2000), police frisked a man and found a gun after having received an anonymous call reporting that a black man wearing a plaid shirt at a particular bus stop had a gun. *Id.* at 268. The Supreme Court held that an anonymous tip must have indicia of reliability to justify a stop and concluded that because the tipster provided no "predictive information," the officers could not test the informant's knowledge or credibility so as to justify the stop and frisk. *Id.* at 271. Unlike *J.L.*, in which a single anonymous caller reported only possession of a gun, Smith and other callers reported multiple gunshots fired in broad daylight and a gunman on the loose. As we, and several of our sister circuits, have previously recognized, *J.L.* does not apply to emergency situations, so because we conclude that Smith's call reported an ongoing emergency, *J.L.* does not help Hampton. *See United States*

*v. Hicks*, 531 F.3d 555, 558-59 (7th Cir. 2008) (collecting cases).

Smith's 911 phone call is much more like the situation presented in *United States v. Drake*, 456 F. 3d 771 (7th Cir. 2006). In *Drake*, a woman called 911 and reported that two groups of people in separate cars were involved in a disturbance and that each group had a gun. *Id.* at 772. She reported that a person in one of the cars pulled a gun on her son-in-law, and when the operator asked her name she provided it. *Id.* at 772-73. Officers recovered a gun after stopping one of the vehicles matching the description provided. *Id.* We held that when officers respond to a 911 call, there is less need for further verification of the caller's identity before acting because of the urgency of the situation. *Id.* at 775.

In *United States v. Hicks*, a 911 caller reported that a man involved in a domestic disturbance with a woman had threatened her with a gun. *Hicks*, 531 F.3d at 557. The 911 call was fraught with inconsistencies and misrepresentations, for example, the caller initially gave a false name. *Id.* We reaffirmed *Drake*'s holding that emergency reports are presumptively reliable and concluded that the caller reported an ongoing emergency and "gave the 911 operator enough information to identify him and his location," which gave officers reasonable suspicion to stop the defendant and frisk him for a gun. *Id.* at 560. Hampton's case is also similar to the ongoing emergency presented in *United States v. Wooden*, 551 F.3d 647 (7th Cir. 2008). There, we held articulable suspicion supported a *Terry* stop when a 911 caller described a man

and reported that the man had pulled a gun on his girl-friend during an argument outside a convenience store. *Id.* at 650.

Here too, we are confident that police faced an ongoing emergency when responding to Smith's call, and as such, Smith was presumptively more reliable than an anonymous tipster. Only five minutes had passed since the first 911 call and Smith's call. Three people in addition to Smith had called 911 and reported that at least five shots had been fired during the day in a residential and commercial area of Indianapolis, and the gunman had not yet been caught. Police were actively trying to find the gunman, whom callers reported had run from the scene.

Even if we agreed with Hampton that the emergency ended before Smith's 911 call, Smith still provided enough information so that the officers could test his knowledge or credibility so as to justify the stop and frisk. *See J.L.*, 529 U.S. at 271. Smith gave a location where the officers could meet him and hold him accountable if the information he gave was false, and he also gave his name when asked even though the operator did not ask his name until after police stopped Hampton. *See Hicks*, 531 F.3d at 560. Smith provided the 911 operator with a play-by-play description of the "shooter's" movements and told the 911 operator he was afraid that the "shooter" could see him. The officer was able to verify Smith's story when he witnessed a white SUV with out-of-town plates driving in the location where Smith reported. There may have been some inconsistencies between Smith's report and the other 911 callers, but the callers all reported the same critical facts—that multiple gunshots

had been fired, that two black men were involved in the shooting, that the shooter lurked between two buildings and that the shooter eventually left the parking lot on foot toward 38th Street. Although the operator did not ask Smith if he had witnessed the shooting, the fact that several other people had reported gunshots makes it reasonable for the operator to have believed that Smith had personally witnessed the shooting. Moreover, Smith was the only caller able to give detailed information about the gunman's current location, and he remained on the phone with the 911 operator until police stopped Hampton and made arrangements to meet with Smith. We reject Hampton's contention that if 911 operators had asked Smith his name earlier in the conversation, they would have learned that he had been convicted of false reporting and this fact would have made him less reliable. Emergency dispatchers are in no position to conduct background checks while gathering information about a crime in progress. *See Wooden*, 551 F.3d at 650 ("[T]he police are entitled to act on what is known at the time; information turned up later neither vindicates nor condemns a search.").

We also reject Hampton's argument that 911 operators, and not the police, concluded reasonable suspicion existed and ordered the stop. Rather, the 911 operators passed on information to the officers who used the specific and articulable facts told to them to determine they had reasonable suspicion. These facts came not only from Smith's call, but also all of the other 911 calls received regarding the shooting. Based on the information gathered in those 911 calls, the officers knew two

black men were involved in a shooting in broad daylight in a busy area and that an SUV might be carrying the fleeing gunman from the area of the shooting near 38th and Pennsylvania streets. *See United States v. Whitaker*, 546 F.3d 902, 909 (7th Cir. 2008) (concluding reasonable suspicion existed where 911 center received two calls in close succession about an altercation at a store and at the scene officers found vehicles matching the description of one automobile given during one call). As made clear by Drawn's second call, 911 operators were in contact with police on the scene before Smith's call. Also, multiple operators were handling the incoming calls reporting the shooting, and the investigation was evolving rapidly. Smith's call described the current whereabouts of the gunman, and officers had no reason to disbelieve the information he was providing because it matched many of the details provided by other callers. *See United States v. Johnson*, 383 F.3d 538, 543 (7th Cir. 2004) ("With *Terry* stops relating to vehicles, such as the present case, the description, proximity of the vehicle to the suspected criminal activity and the proximity to the reported crime are two important factors to be considered in determining reasonable suspicion."). Officers needed to respond quickly to this ongoing threat to public safety, so under the totality of the circumstances, the officers had reasonable suspicion to stop the Jeep in which Hampton was riding.

### B.  *Sufficient Evidence Supported Hampton's Conviction*

Hampton next claims the district court improperly denied his motion for judgment of acquittal based on

insufficiency of the evidence, a decision we review de novo. *United States v. Quilling*, 261 F.3d 707, 712 (7th Cir. 2001). Hampton argues that the evidence presented at trial was insufficient because: (1) the government failed to establish constructive possession by Hampton; and (2) the testimony offered by Smith and Moore was inadequate to allow a reasonable jury to conclude Hampton actually possessed the gun.

Hampton bears a heavy burden in making an insufficiency of the evidence claim. *See United States v. Blanchard*, 542 F.3d 1133, 1154 (7th Cir. 2008). We review the evidence at trial in the light most favorable to the government and "will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009) (internal quotation marks and citation omitted).

In order to sustain a conviction under 18 U.S.C. § 922(g)(1), the government needed to prove Hampton had either actual or constructive possession of the gun.[2] *Rogers*, 542 F.3d at 202. Actual possession occurs when a defendant "knowingly maintains physical control over an object." *United States v. Stevens*, 453 F.3d 963, 965 (7th

---

[2] The government also needed to prove Hampton had a prior felony conviction and that the firearm traveled in or affected interstate commerce, facts to which Hampton stipulated before the trial. *See* § 922(g)(1); *see also United States v. Rogers*, 542 F.3d 197, 202 (7th Cir. 2008).

Cir. 2006). A defendant constructively possesses an item if he has the power and the intent to exercise dominion or control over the object, either directly or through others. *United States v. Thomas*, 321 F.3d 627, 636 (7th Cir. 2003). Constructive possession may be sole or joint, *see United States v. Morris*, 349 F.3d 1009, 1014 (7th Cir. 2003), but mere proximity to the object alone is not enough to prove knowledge of the item, *see Thomas*, 321 F.3d at 636. The government must "establish a nexus between the accused and the contraband, in order to distinguish the accused from a mere bystander." *Quilling*, 261 F.3d at 712 (citation omitted). The prosecution may prove actual or constructive possession by direct or circumstantial evidence. *See Morris*, 349 F.3d at 1014.

Hampton argues that the government only proved his mere proximity to the gun. Hampton attacks the witnesses' testimony because Smith claimed to have seen Hampton with a black gun, while Moore and the indictment stated Hampton's gun was chrome. Hampton argues that Moore's testimony was incredible as a matter of law and challenges whether Moore actually saw what he claimed to have seen because he was twenty-two floors above the scene. Hampton asserts that Moore described someone shooting at a building that showed no signs of bullet holes and that officers found bullet holes in the Nissan Murano which was located in the opposite direction from which Moore described seeing the suspect shoot.

The government presented sufficient evidence to show both constructive and actual possession of the gun. Police recovered two guns from the Jeep in which

Hampton was riding—a chrome Smith & Wesson near the rear seat and a black pistol under the seat of driver, Justin Gray. At trial, officers testified that Hampton emerged from the rear passenger seat of the vehicle on the driver's side and that the Smith & Wesson was found within Hampton's reach based on where he was seated in the vehicle. *See United States v. Wetwattana*, 94 F.3d 280, 283-84 (7th Cir. 1996) (constructive possession found when evidence showed that handgun was accessible and within defendant's reach and control). And, as discussed in more detail below, the government also established a nexus between the gun and Hampton through witness testimony that Hampton was holding a gun before he entered the Jeep. *See Stevens*, 453 F.3d at 966.

Even if we accept Hampton's position that the government's case for constructive possession was weak, the prosecution provided ample evidence to demonstrate actual possession. Both Smith and Moore described seeing Hampton holding a gun, and Moore testified that he saw Hampton place the gun in his waistband before he entered a white SUV. *See United States v. McNeal*, 900 F.2d 119, 121 (7th Cir. 1990) (circumstantial evidence was sufficient to establish that defendant knowingly possessed gun found in his car after police heard shots and then saw defendant's car traveling at high speed from direction where shots were fired). *But see United States v. Chairez*, 33 F.3d 823, 825 (7th Cir. 1994) (no constructive possession where government presented no evidence that defendant ever carried the gun and only offered evidence that defendant was a passenger in the car). We are not swayed by Hampton's argument that Smith described seeing Hampton with a black gun, while

Moore testified he saw the shooter with a silver one. Although it is possible Smith was incorrect about the color of the weapon, he never expressed any doubt that Hampton held a gun in his hand before being picked up by the Jeep's driver. Moreover, our role is not to reconcile inconsistencies in the witnesses' testimony. Hampton's attacks on Smith and Moore are merely an attempt to have us reweigh the evidence, something we may not do because it is the job of the jury to determine the credibility of the witnesses and the veracity of their stories. Hampton's attorney had the opportunity to cross-examine both Moore and Smith. Indeed, Moore admitted on cross-examination that he could not describe the people or objects pictured in photos taken by the defense from his vantage point on the day of the incident, and although Moore was able to describe what Hampton wore the day of the shooting, the district court wisely barred Moore from making an in-court identification of Hampton because of his distance from the scene. Despite the holes the defense poked in the witnesses' stories, the jury chose to believe their testimony, and we cannot disturb its determinations. *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008) ("It is up to the jury to weigh the evidence and determine the credibility of the witnesses; we do not second-guess the jury's assessment of the evidence."). We, therefore, reject Hampton's sufficiency of the evidence challenge.

## C. *Criminal Recklessness Conviction Not a Violent Felony*

The district court sentenced Hampton under the ACCA after determining that Hampton had committed three

"violent felon[ies]" within the meaning of 18 U.S.C. § 924(e)(2)(B); *see also* U.S.S.G. § 4B1.4(a). At sentencing, Hampton argued that one of his prior convictions, an Indiana conviction for residential entry, did not qualify as a predicate felony under the ACCA. Relying on *United States v. Gardner*, 397 F.3d 1021, 1024 (7th Cir. 2005), which held Indiana's offense of residential entry is a "crime of violence" under § 4B1.2(a) of the United States Sentencing Guidelines because residential entry "entails an entry into a residence without permission and presents the same risk [as burglary] of encountering an occupant," the district court rejected this argument. However, after Hampton's sentencing, the Supreme Court decided *Begay v. United States*, 128 S. Ct. 1581 (2008), which shed new light on applying recidivist sentencing enhancements. Now, Hampton argues that post-*Begay*, residential entry no longer qualifies as a "violent felony," and that he should be resentenced. We review de novo a district court's determination that a prior conviction is a "violent felony." *See United States v. Smith*, 544 F.3d 781, 783 (7th Cir. 2008).

The ACCA states that:

(B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year . . . that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves

> conduct that presents a serious potential
> risk of physical injury to another[.]

18 U.S.C. § 924(e)(2). In 1996, Hampton was convicted under Indiana's residential entry statute, which provides that: "[a] person who knowingly or intentionally breaks and enters the dwelling of another person commits residential entry, a Class D felony."

Ind. Code § 35-43-2-1.5. Because residential entry does not have an element of use of physical force as required to fall under subsection (i) of § 924(e)(2)(B) and is not among the listed offenses in subsection (ii), we must analyze the offense under the residual clause of subsection (ii) that captures crimes involving "conduct that presents a serious potential risk of physical injury to another."

We turn first to *Begay*, in which the Supreme Court examined the ACCA provision that imposes a fifteen-year mandatory minimum sentence upon felons who unlawfully possess a firearm and who have three or more previous convictions for certain drug crimes or "violent felon[ies]." *Begay*, 128 S. Ct. at 1583 (citing 18 U.S.C. § 924(e)(1)). The Court determined that a defendant's prior conviction for driving under the influence of alcohol ("DUI") did not constitute a "violent felony" under the Act's definition. *Id.* at 1588. The Court found that DUI, in order to be a "violent felony," must fall within the scope of the residual clause of other crimes involving a serious potential risk of physical injury to another. *Id.* at 1584. The Court concluded that DUI falls outside of the scope because it is too unlike the ACCA's listed offenses

and reasoned that the examples given were limited to "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 1585. The Court explained that DUI differed from the enumerated offenses because "the listed crimes all typically involve purposeful, violent and aggressive conduct," and the DUI statute was more like a strict liability offense. *Id.* at 1586 (internal quotation marks omitted).

In light of these principles, we now turn to whether the crime of residential entry in Indiana meets the definition of a "violent felony" under the residual clause. In doing so, we must look to the statutory definition of residential entry and not the underlying facts of Hampton's prior conviction. *See Chambers v. United States*, 129 S. Ct. 687, 690 (2009); *Taylor v. United States*, 495 U.S. 575, 600 (1990). We note that although the offense of residential entry is listed in the same chapter as burglary in the Indiana Code, residential entry does not meet the definition of a generic burglary because residential entry does not require the intent to commit a felony therein. *See Taylor*, 495 U.S. at 599. However, the requirement that one must intend to commit a felony inside the home in order to be convicted of burglary is not dispositive. The real inquiry under the residual clause is whether the offense prohibits conduct that "presents a serious potential risk of physical injury to another." *See id.* at 600 n.9 ("The Government remains free to argue that any offense—including offenses similar to generic burglary—should count towards enhancement as one that 'otherwise involves conduct that presents a serious

potential risk of physical injury to another' under
§ 924(e)(2)(B)(ii)."). We conclude that residential entry is
similar in risk to the enumerated offense of burglary
because both create a substantial risk that if the offender
is confronted by someone inside the home, violence will
ensue. *See United States v. Spells*, 537 F.3d 743, 752 (7th
Cir. 2008) (fleeing from an officer in a vehicle qualifies as
a "violent felony" because statute requires knowing and
intentional conduct and because of the risk of danger
posed to nearby bystanders and officers); *see also United
States v. Scoville*, 561 F.3d 1174, 1180 (10th Cir. 2009)
(prior convictions for third-degree burglary, which pro-
hibited trespassing in an occupied structure or habitation
with the purpose of committing any criminal offense or
misdemeanor, qualified as a "violent felon[ies]" because
"the risk posed is similar to that of generic burglary").
Indeed, when pressed at oral argument, Hampton's
counsel could not give an example of a residential entry
that is less likely to precipitate violence than a burglary.
Moreover, residential entry constitutes the type of inten-
tional conduct that *Begay* requires—the statute itself
requires "knowingly or intentionally" breaking and
entering into someone's home. Ind. Code § 35-43-2-1.5;
*see also Begay*, 128 S. Ct. at 1587. Additionally, the act of
intentionally breaking into another person's home, re-
gardless of the unwanted intruder's intention once
inside, is inherently aggressive and creates a serious risk
that the homeowner may resort to violence to defend
himself or his loved ones. "The main risk of burglary
arises not from the simple physical act of wrongfully
entering another's property, but from the possibility that

an innocent person might confront the burglar during the crime." *James v. United States*, 550 U.S. 192, 194 (2007) (holding that attempted burglary qualifies as a "violent felony" under the ACCA). For these reasons, residential entry qualifies as a "violent felony" within the meaning of the ACCA.

Although we conclude that residential entry qualifies as a predicate violent felony, our inquiry does not end there. Upon reviewing the record, we discovered that one of Hampton's other prior convictions, an Indiana conviction for criminal recklessness, similarly presents a *Begay* problem. At sentencing, the district court relied on three of Hampton's prior felony convictions to sentence him as an armed career criminal—resisting law enforcement, residential entry and criminal recklessness, a class D felony under Indiana Code § 35-42-2-2. Neither of the parties identified Hampton's 1992 conviction for criminal recklessness as an issue in the district court or on appeal. But, until we decided otherwise in *United States v. Smith*, a case issued after Hampton was sentenced, a conviction in Indiana for criminal recklessness served as a predicate violent felony under the ACCA. 544 F.3d 781, 787 (7th Cir. 2008); *United States v. Jackson*, 177 F.3d 628, 633 (7th Cir. 1999) (Indiana conviction for criminal recklessness qualified as "crime of violence"). Our recent post-*Begay* precedent has further illuminated the proper analysis for determining whether a prior conviction qualifies for a recidivist enhancement. *See United States v. Woods*, 576 F.3d 400, 401 (7th Cir. 2009) (reiterating Smith's holding); *see also United States v. High*, 576 F.3d 429, 430 (7th Cir.

2009) (plain error occurs if a district court incorrectly classifies a defendant's prior conviction as a violent felony).

We asked both parties to file statements of position to address how *Smith* and *Woods* applied to the criminal recklessness conviction relied on by the district court to sentence Hampton as an armed career criminal. The government contends that Hampton has waived this issue, thus precluding our review. Waiver however, requires the intentional relinquishment or abandonment of a known right. *United States v. Sumner*, 265 F.3d 532, 537 (7th Cir. 2001). *Begay*, *Chambers*, *Smith*, and *Woods* were all decided after Hampton was sentenced, and all but *Begay* were decided after Hampton's opening brief was filed. We construe waiver principles liberally in favor of defendants, *id.*, and doing so here requires finding that Hampton has forfeited, rather than waived, this issue. Counsel's decision not to pursue this issue was not intentional. Neither party noticed the problematic reliance on the criminal recklessness conviction as a basis for enhancement, and Hampton never affirmatively waived the argument. This case is not like *United States v. Foster*, 577 F.3d 813, 815-16 (7th Cir. 2009), where defense counsel at oral argument affirmatively waived any argument that a prior Indiana criminal recklessness conviction was not a crime of violence. Hampton certainly did not waive it in this court, and there is no evidence in the record that Hampton waived the issue in the district court.

The government concedes that if there was no waiver a remand would be necessary, and we agree. Forfeiture,

the failure to make a timely assertion of a right, permits plain error review. *Sumner*, 265 F.3d at 537. In light of *Begay* and its progeny, the district court committed plain error when it enhanced Hampton's sentence based on the determination that criminal recklessness in Indiana constituted a violent felony under the ACCA. Without Hampton's criminal recklessness conviction, he does not have the requisite number of felony convictions to qualify for the sentence enhancement. Hampton's classification as an armed career criminal subjected him to a statutory minimum sentence of fifteen years and also increased his offense level under the Guidelines from Level 28 to Level 34. *See* 18 U.S.C. § 924(e)(1); U.S.S.G. § 4B1.4. So, we remand his case for resentencing. *Cf. Greenlaw v. United States*, 128 S. Ct. 2559, 2566 (2008) ("This Court has indeed noticed, and ordered correction of, plain errors not raised by defendants, but we have done so only to benefit a defendant who had himself petitioned the Court for review on other grounds."); *DeRoo v. United States*, 223 F.3d 919, 926-27 (8th Cir. 2000) (raising, sua sponte, that prior conviction did not count as predicate offense under ACCA and remanding for resentencing).

## III. CONCLUSION

Therefore, we AFFIRM Hampton's conviction, but VACATE his sentence and REMAND his case for resentencing.