┌─────────────────────────────────────────────────────┐
│              **NONPRECEDENTIAL DISPOSITION**              │
│   To be cited only in accordance with Fed. R. App. P. 32.1   │
└─────────────────────────────────────────────────────┘

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 9, 2009
Decided February 2, 2010

**Before**

JOEL M. FLAUM, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| No. 07-3391 | Appeal from the United States District Court for the Northern |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | District of Illinois, Eastern Division. |
| | No. 06-CR-562 |
| *v.* | |
| | Charles R. Norgle, Sr., |
| SALEM FUAD ALJABRI, *Defendant-Appellant*. | *Judge*. |

**O R D E R**

In 2007 the United States charged Salem Fuad Aljabri in a superseding indictment with nine counts of wire fraud in violation of 18 U.S.C. § 1343, five counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and eleven counts of structuring under 31 U.S.C. § 5324(a)(3). The case went to trial and the jury returned a verdict of guilty on all counts.[1] Aljabri was then sentenced to a prison term of 90 months. On appeal Aljabri challenges the sufficiency of the evidence supporting his money-laundering and structuring

_____

[1] The district court granted the government's motion to dismiss one of the structuring counts, Count 14, before the case was submitted to the jury.

convictions.  The government concedes that Aljabri's money-laundering convictions must be vacated, and we accept this concession.  The structuring counts were supported by sufficient evidence however, and we therefore affirm Aljabri's convictions on those counts.

## I. Background

Although it led to a lengthy 25-count indictment, Aljabri's criminal activity was rather simple.  Aljabri, along with his codefendant Hope Cordova, schemed to defraud and obtain money from the United States Department of Agriculture Food and Nutrition Service's Food Stamp Program ("program") by purchasing program benefits ("food stamps") from customers for discounted amounts of cash.  This relatively common form of food-stamp fraud is sometimes referred to as "trafficking."  Aljabri was the owner of the Sobba Food Mart, a neighborhood grocery store in Chicago that was enrolled as an authorized retailer in the federal food-stamp program.  From March 2003 to June 2004, Aljabri, through Sobba, unlawfully purchased program benefits from food-stamp recipients.  After redeeming over $1 million in program benefits, Sobba was terminated from the program.  In 2005 Aljabri was once again able to access program benefits by instructing Cordova, his girlfriend, to open a new store, the White Bird grocery store.  White Bird successfully enrolled in the program, and Aljabri resumed his trafficking scheme.  Aljabri was arrested in August of 2006 for this fraudulent activity and charged with multiple counts of wire fraud, money laundering, and structuring.

### A. Wire Fraud

The government was able to pursue wire-fraud charges against Aljabri because of the manner in which program benefits must be processed.  While the food-stamp program was formerly coupon-based, it no longer operates in that manner.  Instead, program recipients—at least those in Illinois—are provided with a "Link card," which functions much like a debit card.  Benefits are automatically credited to recipients' Link card accounts each month.  Accredited retailers, such as Sobba and White Bird, are provided with "Link card machines."  After selecting food items, the program recipient swipes his Link card through this machine.  The machine then interfaces with a computer system located in Austin, Texas, which maintains data on each Link card account and approves (or rejects) all program-benefit transactions.  At the end of each day, the Texas computer then tallies the totals owed to each retailer and correspondingly credits that retailer's account.

The food-stamp program explicitly prohibits the redemption of benefits for cash, but the government presented overwhelming evidence that Aljabri repeatedly engaged in such behavior.  In addition to testimony from program recipients who admitted selling their

benefits to Aljabri for cash, the government presented convincing circumstantial evidence that Aljabri was defrauding the program. For instance, from March of 2003 until June of 2004, Sobba redeemed over $1.2 million in program benefits, which accounted for over 97% of its total business during that time. Many of these Link card transactions involved "purchases" exceeding $100 in value even though Sobba apparently had a limited food selection and no shopping carts or baskets. Finally, Mohammad Malkawi, who purchased Sobba from Aljabri, testified that despite the fact that he had improved the store's facilities and expanded its inventory, his successor store averaged $14,000 to $17,000 in monthly business, and only half of that involved Link transactions. The government presented similar evidence (both direct testimony from program recipients as well as circumstantial evidence based on the nature and quantity of Link transactions processed) to show that Aljabri conducted similar fraud at the White Bird grocery store.

## B. Money Laundering

The government pursued money-laundering charges against Aljabri on the theory that Aljabri would use the cash he received from earlier trafficking transactions in order to acquire program benefits from subsequent "customers." The premise was that because each time Aljabri illegally purchased program benefits he needed to front the cash before getting reimbursed at the end of the day by the Link system, he required a steady stream of funds to keep his operation afloat. The government presented evidence that Aljabri would routinely make large cash withdrawals from his designated Link account in order to facilitate these illegal payments to program recipients. To bolster its case that these withdrawals were made for the purpose of trafficking and not for some legitimate pursuit, the government introduced evidence that Aljabri did not generally use cash to cover other operational expenses such as inventory purchases, utilities, and rent. The government argued to the jury that in this way Aljabri knowingly used the "proceeds" of one instance of wire fraud to "promote" another.

## C. Structuring

As we have noted, Aljabri's trafficking operation required Aljabri to keep large sums of cash on hand in order to transact business with program recipients. Sobba maintained an account with the Cole Taylor Bank in Chicago. All of Sobba's Link reimbursements were wired to this account. In order to fund future Link purchases, Aljabri obtained cash from this account by writing checks to cash. The government presented evidence that from March 2003 through June 2004, Aljabri cashed at least 155 such checks from this account, withdrawing approximately $942,485 in total. Excluding those checks cashed in the days immediately preceding Sobba's disqualification from the program, Aljabri only cashed two checks in excess of $10,000. Counts 12-13 and 15-22 pertained to ten separate transactions that the government asserted were instances of structuring. In each instance the

government alleged that Aljabri structured the transaction to avoid the $10,000 threshold for currency transaction reporting requirements by purposefully arranging to withdraw an amount in excess of $10,000 by cashing a series (between two and four) of checks that summed to a total greater than $10,000 but had individual values below this amount. The government further alleged that for each count the financial transactions involved were all "conducted" on a single date. In addition to this circumstantial evidence, Immigration and Customs Enforcement Special Agent Tamara Yoder testified that following his arrest, Aljabri, who had waived his right to remain silent, admitted he was aware of the federal reporting requirements for currency transactions in excess of $10,000.

## II. Discussion

On appeal Aljabri argues the evidence was insufficient to convict him of money laundering and structuring. In considering a sufficiency-of-the-evidence challenge, "[w]e review the evidence at trial in the light most favorable to the government and 'will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Hampton*, 585 F.3d 1033, 1040 (7th Cir. 2009) (quoting *United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009)).

### A. Money Laundering

Aljabri was convicted of five counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits the use of "the proceeds of some form of unlawful activity" in a financial transaction "with the intent to promote the carrying on of specified unlawful activity." To convict Aljabri of money laundering, the government was required to prove the following four elements beyond a reasonable doubt: (1) Aljabri knowingly conducted the charged financial transactions; (2) those transactions involved the proceeds of illegal activity; (3) Aljabri knew the property involved in these transactions represented illegal proceeds; and (4) Aljabri conducted the charged transactions with the intent to promote the carrying on of the unlawful activity.

Aljabri contends that the government did not present sufficient evidence that the charged financial transactions involved "proceeds" of illegal activity as that term has been defined in recent opinions of this circuit and of the Supreme Court. The government concedes this error and agrees that Aljabri's money-laundering convictions (Counts 7-11) should be vacated.

The term "proceeds" is not defined in the money-laundering statute. In *United States*

*v. Scialabba*, 282 F.3d 475, 475 (7th Cir. 2002), this court held that "at least when the crime entails voluntary, business-like operations, 'proceeds' must be net income [rather than gross income]; otherwise the predicate crime merges into money laundering (for no business can be carried on without expenses) and the word 'proceeds' loses operational significance." The Supreme Court's recent decision in *United States v. Santos*, 128 S. Ct. 2020 (2008), addressed this issue; unfortunately, *Santos* yielded a fractured result. As we have recently explained:

> Four Justices in *Santos* concluded that 'proceeds' in § 1956 always means net income. Four concluded that the word always means gross income. Justice Stevens concluded that the meaning depends on the nature of the crime—that it means net income for unlicensed gambling (the subject of *Santos* and *Scialabba*) but could mean gross income for drug rings.

*United States v. Hodge*, 558 F.3d 630, 633 (7th Cir. 2009).

Since the government concedes that the "net income" definition applies in this case, we need not decide whether, under Justice Stevens's approach, a conviction for money laundering involving proceeds from wire fraud (for food-stamp trafficking) would require the use of "net income" or "gross income" from that fraud.[2] *See id.* at 634 ("Such a concession cannot bind the court to one legal rule rather than another, but it can forfeit the benefit of a particular rule for one case."). The government further acknowledges that at trial it failed to introduce sufficient evidence to satisfy its burden of proof concerning this "net proceeds" element of the money-laundering offense. While the government presented evidence that Aljabri used Link funds to pay for program benefits, it never articulated a theory as to why those food-stamp purchases should properly be considered a reinvestment of the net profits of Aljabri's fraudulent enterprise.

## B. Structuring

Aljabri was convicted of ten counts (Counts 12-13 and 15-22) of structuring under 31 U.S.C. § 5324(a)(3). Federal law requires financial institutions to file a Currency Transaction Report with the government for financial transactions in which a customer makes a "deposit, withdrawal, exchange of currency or other payment or transfer . . . involv[ing] . . . currency of more than $10,000." 31 C.F.R. § 103.22(b)(1); 31 U.S.C. § 5313(a). Section 5324(a)(3) then prohibits individuals from deliberately "structuring" their financial transactions "for the purpose of evading th[ose] reporting requirements."

---

[2] Also, because of the government's concession, we need not consider whether the jury was properly instructed as to the correct definition of "net proceeds."

Aljabri challenges his structuring convictions on two different grounds. Aljabri first claims that he cannot legally be found guilty of structuring on Counts 17, 18, 20, 21, and 22 because the financial transactions relating to each of those five counts all took place on different days. In making this argument, Aljabri seizes on Cole Taylor's particular method of processing checks. At Cole Taylor, "banking" activities cease for the week every Friday at 3 p.m. even though the bank remains open past 3 p.m. on Fridays and is open on Saturdays as well. Thus a customer can cash a check at Cole Taylor after 3 p.m. on a Friday, but that check will not be officially processed until the following Monday. In such a circumstance, the bank's records will reflect the time that the check was actually presented to be cashed (say 4:57 p.m.), but will provide the date that corresponds to the following Monday (or whatever is the next "banking" day).

Aljabri argues that with respect to five of the structuring counts, the government misled the jury to believe that the alleged transactions took place on a single day when they were in fact spread out over multiple days. The problem with this argument is that financial transactions need not occur, or even be processed, on a single date in order to constitute structuring. Treasury regulations have defined "structuring" as follows:

> [A] person structures a transaction if that person . . . conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this part. 'In any manner' includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. *The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.*

31 C.F.R. § 103.11(gg) (emphasis added). Additionally, in *United States v. Davenport*, 929 F.2d 1169, 1173 (7th Cir. 1991), this court held that § 5324(a)(3) can apply to financial transactions that were conducted on separate days. There is no colorable argument for why § 5324(a)(3) should be confined only to transactions that occur during a single day; in fact, as the government correctly points out, such a construction would undermine the purpose of the provision by providing a roadmap for legally evading the reporting requirements.[3]

---

[3] Aljabri also argues that his convictions on these five structuring counts should be vacated on the grounds that the government's theory at trial was inconsistent with the language of the superceding indictment, which alleged that each set of structured transactions was "conducted" on the same day. This "variance" claim was first raised in Aljabri's reply brief and is therefore forfeited. *United States v.*

(continued...)

Finally, Aljabri attacks his structuring convictions (all of them this time) on the ground that the government failed to establish that he had the requisite intent to structure. This argument is without merit. In addition to the hefty circumstantial evidence the government presented relating to Aljabri's consistent practice of conveniently withdrawing large sums of money in short intervals just under the $10,000 reporting threshold, there was also the testimony of Special Agent Yoder that Aljabri acknowledged his awareness of the reporting requirements. When viewed in total, there is more than enough evidence to uphold the jury's verdict, particularly in light of the high burden Aljabri must meet to prevail on a sufficiency challenge. *See, e.g.*, *United States v. Bustamante*, 493 F.3d 879, 884 (7th Cir. 2007) ("[T]he Court will reverse only if 'the fact finder's take on the evidence was wholly irrational.'" (quoting *United States v. Hoogenboom*, 209 F.3d 665, 669 (7th Cir. 2000))).

## III. Conclusion

Aljabri's money-laundering convictions are VACATED, and his structuring convictions are AFFIRMED. This case is REMANDED to the district court for resentencing on the surviving wire-fraud and structuring counts.

---

[3](...continued)
*Boyle*, 484 F.3d 943, 946 (7th Cir. 2007).